[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15162
Non-Argument Calendar
_____

D.C. Docket No. 6:18-cv-00884-PGB-KRS

JOSE VIELMA,
CARMEN NILDA CAPO-QUINONES,
BERNEDETTE CRUZ,
DIMARIE RODRIGUEZ,
BERNICE DEJESUS,
ISMAIL MORALES,
OLGA M. DISLA-MENCIA,
DIGNA ROSA-FERNANDEZ,
MARELY MENENDEZ,
KEINON CARTER, et al.,

Plaintiffs-Appellants,

versus

ADAM TODD GRULER,
JOHN DOES 1-20,
JOHN DOES 21-30,
CITY OF ORLANDO,
JOHN DOES 1-15,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 6, 2020)

Before JILL PRYOR, ANDERSON, and JULIE CARNES, Circuit Judges.

PER CURIAM:

On June 12, 2016, a lone shooter, Omar Mateen, entered the Pulse nightclub in Orlando, Florida, armed with a semi-automatic rifle and a semi-automatic pistol. He ultimately shot numerous patrons in the club, killing forty-nine people and injuring fifty-three others.  The police eventually entered the club, shooting and killing Mateen.

Asserting claims pursuant to 42 U.S.C. § 1983, the fifty-six plaintiffs named in this action sued the City of Orlando and three groups of Orlando police officers. First, Orlando police officer Adam Gruler was sued by those plaintiffs who were injured and the estates of those individuals who were killed.  Gruler was working a security detail at the club on the evening of the shooting.  According to the complaint, Gruler was temporarily away from his duty station at the club when Mateen entered, and Plaintiffs allege that once Gruler heard the shooting going on inside the club, he should have immediately reentered and attempted to take out the shooter (or shooters) who were inside.  Plaintiffs contend that by failing to engage

2

the shooter inside the club, Gruler violated the victims' rights to substantive due process under the United States Constitution.

Second, a subset of plaintiffs who had been on site during the shooting sued unidentified law enforcement officers whom they say wrongfully detained them shortly after the shooter had been killed.  Third, a subset of plaintiffs sued unidentified law enforcement officers who seized their personal property in the immediate aftermath of the shooting.  These latter two groups of plaintiffs claim that their Fourth Amendment constitutional rights were thereby violated by these unnamed defendants.

Finally, as to the City of Orlando,  Plaintiffs allege that the City is responsible for any constitutional violations committed by its officers because the City failed to train these officers how to properly respond to active-shooter threats and how to conduct lawful arrests and detentions following a mass slaughter like the one perpetrated by Mateen.

Acknowledging the immeasurable suffering inflicted by Mateen on the plaintiffs, the district court noted that "if magnitude of loss determined whether Plaintiffs could recover, then they surely would."  Nonetheless, the district court granted Defendants' motion to dismiss the complaint, concluding that Plaintiffs had failed to plausibly allege any liability on the part of Defendants for the horrendous loss inflicted on them by Mateen.  Specifically, the district court ruled

that Officer Gruler was entitled to qualified immunity, that Plaintiffs had alleged insufficient facts to identify the John Doe-officer defendants, and that Plaintiffs' allegations failed to state a plausible claim for municipal liability. We agree with the district court as to the enormity of the loss visited upon the victims who were injured or killed. Nonetheless, we also agree with the district court that Plaintiffs have failed to plausibly allege liability on the part of Defendants, and we therefore affirm its order of dismissal.

## I.    PROCEDURAL BACKGROUND

In June 2018, fifty-six victims and personal representatives of victims of the Pulse nightclub shooting filed their first amended complaint, suing Officer Gruler, the City of Orlando, and thirty John Doe defendants under 42 U.S.C. § 1983 for violations of their constitutional rights. This complaint contained four counts. Count I alleged that Officer Gruler, who was tasked with defending the nightclub, and John Does 1–20, who arrived during the shooting, acted with deliberate indifference to the victims' constitutional rights when they failed to immediately enter the Pulse nightclub to neutralize the shooter. Count II alleged that John Does 21–30 unlawfully detained or falsely arrested several of the victims following the shooting. Count III alleged that, after the shooting, some John Doe defendants unlawfully seized victims' personal property. Finally, Count IV alleged that, by failing to train its employees how to neutralize active-shooter threats and how to

4

conduct lawful arrests and detentions after a mass shooting, the City was liable for any constitutional violations committed by its police officers. The complaint contained no descriptions of the John Doe defendants, but implied that they were associated with law enforcement.

At a hearing on August 1, 2018, the district court warned Plaintiffs that their complaint contained "clear violations of Eleventh Circuit precedent" that would "dictate the outcome of a motion to dismiss." In particular, the court advised Plaintiffs that shotgun pleading was impermissible and that fictitious-party pleading was prohibited unless the complaint described the John Doe defendants with enough specificity to enable service of process. The court noted that "John Doe" pleading "wreaks havoc on a defendant's ability to respond" and asked Plaintiffs how they intended to promptly identify the names of the John Does before the deadline for amending the complaint.

Plaintiffs responded that they would rely on initial disclosures, which they assumed would include police reports identifying the John Does' names. Plaintiffs said that it was "not going to take longer than 30 days to do that." Hearing this, the court expressed skepticism that initial disclosures from the named defendants, Officer Gruler and the City, would include the information Plaintiffs sought, "particularly when the officers are not alleged with any particularity." The court sympathized with Plaintiffs' difficulty in identifying specific officers without

5

police reports, but explained the typical solution to this sort of problem: "You don't bring all the case at one time. . . . So you file against the person you have. You conduct discovery in the normal course of events, and you bring a separate lawsuit." Acknowledging, however, that "how [Plaintiffs] want to procedurally set [their] case up for trial is totally within [their] discretion," the court warned Plaintiffs' counsel that "there are choices, and there are consequences." "When you choose to bring it all at one time," the court warned, "you build in procedural problems that are of your own making."

Following the hearing, the district court *sua sponte* dismissed the above-described first amended complaint as an impermissible shotgun pleading. The court granted leave to amend but again warned Plaintiffs that fictitious-party pleading—that is, suing unnamed John Doe defendants—would not be permitted.

On August 15, 2018, Plaintiffs filed a second amended complaint. This complaint largely mirrored earlier versions of the complaint, except that it reduced the number of fictitious defendants from thirty down to fifteen. Specifically, this complaint alleged that John Does 1–12 detained or arrested many of the victims and that John Does 13–15 searched and seized victims' property. Yet, while Plaintiffs reduced the number of John Doe defendants named in the suit, Plaintiffs totally ignored the district court's admonition that the naming of fictious defendants would not be permitted. Specifically, Plaintiffs provided no

descriptions for John Does 10, 11, and 14 and described the remaining John Does in general terms.  John Does 1–9, 12–13, and 15 were described, respectively, as "a middle-aged white male [officer,]" "a male detective," "a tall medium white Orlando Police Department Officer," "one of the officers at the hospital," "a female police officer of the Orlando Police Department who wore a dark blue uniform," "the police officer in charge," "a male [officer] of Asian descent," "a built black male Orlando Police Officer," "a blonde short haired female officer," a "white male officer with black hair," a "female white officer about 5 feet 10–11 inches in height," and "an FBI Agent."[1]  In short, the second amended complaint named as defendants Officer Gruler and the City in Count I, John Does 1–12 and the City in Count II, John Does 13–15 and the City in Count III, and the City in Count IV.

The court adopted the parties' joint proposed scheduling order, which set an October 26, 2018 deadline for initial disclosures and a December 14, 2018 deadline to add parties or amend the pleadings.  On September 14, 2018, Defendants moved to dismiss the second amended complaint and the parties filed a joint motion to stay "all discovery, including Rule 26 initial disclosures," pending

---

[1]  The second amended complaint also included allegations against several other John Doe FBI agents and a U.S. Attorney, who were not included in the case caption and thus are not defendants in the case. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties[.]").

resolution of the motion to dismiss.  Even though Defendants had argued in their

motion to dismiss that Plaintiffs failed to plead sufficient facts to identify the

unnamed defendants, Plaintiffs nonetheless agreed that a stay of discovery

"w[ould] not unduly prejudice Plaintiffs."[2]  The court granted the motion to stay in

part, holding discovery in abeyance until the earlier of November 16, 2018 or one

day after the court ruled on the motion to dismiss.  As the expiration of the stay

neared, the parties jointly moved to extend the stay's deadline, stating once again

that "the stay will not unduly prejudice Plaintiffs."  The court denied the motion to

extend the stay of discovery and granted Defendants' motion to dismiss.

In its November 14, 2018 order dismissing Plaintiffs' second amended

complaint, the court concluded that Officer Gruler was entitled to qualified

immunity on Count I, which alleged that he had violated the victims' substantive

due process rights by failing to immediately enter Pulse to neutralize the shooter.

The court reasoned that Plaintiffs had not alleged a constitutional violation, given

that the Supreme Court has held that the Due Process Clause imposes no obligation

on the states to protect individuals against private violence.  The court held that

even if such an obligation existed, a substantive due process violation in such a

context would require that Officer Gruler's conduct constitute "deliberate

---

[2]  Notably, Plaintiffs agreed to stay discovery without requesting an extension of the December 14, 2018 deadline to add parties, even though they had previously indicated that discovery was necessary to identify the John Doe defendants.

8

indifference" or "shock the conscience." Yet, the court noted, Plaintiffs' allegations failed to meet these high standards. Finally, even assuming Plaintiffs' allegations stated a constitutional claim, the court concluded that qualified immunity applied because the law was not clearly established that Gruler's actions violated the victims' substantive due process rights.

As to Counts II and III against the John Doe defendants, which alleged unlawful detentions and seizures, the court found that Plaintiffs had failed to heed the court's repeated warnings that fictitious-party pleading was prohibited. Because Plaintiffs failed to describe a single Doe defendant specifically enough to enable service of process, the court dismissed the claims against the Doe defendants. The court further found that even if an exception to the fictitious-party rule existed for cases where discovery would reveal the defendants' identities, Plaintiffs did not qualify for the exception because they had not sought discovery. To the contrary, Plaintiffs had joined in the motions to stay discovery.

Finally, the court dismissed all claims against the City. As to Counts I–III, the court concluded that Plaintiffs had not pled any facts supporting municipal liability and had instead relied on conclusory allegations. The court dismissed Count IV, which alleged municipal liability for failure to train, because Plaintiffs failed to plead facts showing an underlying constitutional violation or an obvious

9

need for training that could establish liability under a single-incident theory.  This appeal followed.

## II.    DISCUSSION

### A.    Standards of Review

We review *de novo* a district court's grant of a motion to dismiss based on qualified immunity or failure to state a claim, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiff. *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019); *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).  "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'"  *Hunt*, 814 F.3d at 1221 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

We review *de novo* a district court's dismissal of a claim asserted against an unnamed defendant.  *See Richardson v. Johnson*, 598 F.3d 734, 737–38 (11th Cir. 2010).  Finally, a district court's decision to drop a party is reviewed for an abuse of discretion.  *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at

10

any time, on just terms, add or drop a party."); *see also Fritz v. Am. Home Shield Corp.*, 751 F.2d 1152, 1154 (11th Cir. 1985).

### B.    Officer Gruler

On appeal, Plaintiffs argue that the district court erred in granting Officer Gruler qualified immunity.  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation marks omitted).  To show that an official who acted within the scope of his discretionary authority[3] is not entitled to qualified immunity, a plaintiff must establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (quotation marks omitted).

Here, Plaintiffs claim that the injured and murdered victims' Fourteenth Amendment substantive due process rights were violated when, upon hearing the gunshots, Officer Gruler failed to immediately reenter the club to attempt to disarm or shoot Mateen.  The Fourteenth Amendment provides that "[n]o State shall . . .

---

[3]  In the second amended complaint, Plaintiffs alleged that Officer Gruler was "working in his official capacity as a law enforcement officer for the City of Orlando."  Accordingly, Plaintiffs do not dispute that Officer Gruler was acting within the scope of his discretionary authority during the shooting.

deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As the district court correctly observed, Plaintiff's entire claim against Officer Gruler boils down to an argument that the Due Process Clause imposes an affirmative duty on police officers to protect individuals from private acts of violence. But that is precisely the argument that the Supreme Court rejected in *DeShaney v. Winnebago County Department of Social Services*, which held that, outside the custodial context,[4] "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197–98 (1989). In *DeShaney*, the plaintiffs, a brain-damaged child and his mother, claimed that the county department overseeing children's services had failed to take any action to protect the child against

---

[4] When the State, however, has deprived someone of his liberty through incarceration or institutionalization, the Due Process Clause requires that the conditions of confinement provided by the State meet certain minimal standards. *Collins v. City of Harker Heights*, 503 U.S. 115, 127 (1992). Before this Court, Plaintiffs now argue that because Florida law prohibited them from carrying a weapon in a nightclub, the State had effectively placed them in custody and, like a prison warden, the State was required to take necessary steps to see that these patrons were not the victims of violence committed by a private person. As Plaintiffs have raised this argument for the first time on appeal, we need not address its merits. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004). Even were we inclined to do so, we note that Plaintiffs cite no case authority for their argument that Florida's ban on carrying firearms in nightclubs created a custodial relationship with the State of Florida. In any event, as discussed *infra*, even were we to find merit in this newly-raised argument, Plaintiffs still could not defeat qualified immunity for Officer Gruler because the second prong of the test requires a plaintiff to show the existence of clearly established law alerting the accused officer that his conduct was unconstitutional. There is no clearly established law putting Officer Gruler on notice that Florida's ban on firearms in a nightclub meant that the patrons of the Pulse nightclub were in the custody of the State of Florida.

12

repeated beatings by his father, even though the agency had been alerted to the father's conduct. *Id.* at 193. The Court explained its rejection of the plaintiffs' claim that the county's inaction violated the Due Process Clause:

> The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without due process of law, but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195 (quotation marks omitted). Thus, the Due Process Clause does not entitle an individual to the affirmative assistance of the government "even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196; *accord Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005).

Even were we today to announce, as a new principle, a rule holding that a police officer on a security detail outside a private establishment has a <u>constitutional</u> duty to forego other potential responses and that he must instead immediately enter the establishment in an effort to neutralize a shooter, Plaintiffs would still be unable to defeat Officer Gruler's qualified immunity defense. This is so because a police officer, like all individual state actors, enjoys this immunity absent the existence of legal precedent that clearly alerts the officer to the constitutional requirement that the officer act in the way that the plaintiff alleges he should have behaved.

13

A constitutional right is not clearly established unless existing precedent places the "constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quotation marks omitted).  The most common way for a plaintiff to show that a right is clearly established is to "point to a case with 'materially similar' facts decided by the Supreme Court, the Court of Appeals, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1310 (11th Cir. 2019).  Absent such a case, a plaintiff can rely on "general statements of the law" only in an "obvious case" where those general rules would have given officers "fair and clear warning" of their constitutional duties in the specific situation at issue.  *Kisela*, 138 S. Ct. at 1153 (quotation marks omitted).

Plaintiffs have failed to cite any case addressing materially similar facts that clearly establishes the existence of the duty that Plaintiffs assign to Officer Gruler. This is not surprising, given the holding by the Supreme Court in *DeShaney* that contradicts Plaintiffs' contention.  Plaintiffs allege that Officer Gruler violated the victims' substantive due process rights by failing "to enter the club immediately after the shooting began to neutralize [the] Shooter," when he knew that the victims faced a serious risk of harm and "were not lawfully permitted to be armed."  Yet, Plaintiffs have not identified any caselaw addressing active-shooter threats.  Instead, they rely on two district court cases that they admit "involved deliberate indifference to medical needs" rather than deliberate indifference to

14

harm inflicted by a third party.  Setting aside the fact that these district court cases are inapposite,[5] they are necessarily insufficient for Plaintiffs' purposes because only "the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state" can demonstrate a clearly established right.  *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016).

Because Plaintiffs failed to identify a clearly established constitutional right that would have required Officer Gruler to immediately reenter the nightclub to attempt to neutralize the shooter, the district court did not err in granting the officer qualified immunity and dismissing the claim against him.

## C.    John Doe Defendants

In Counts II and III, Plaintiffs named as defendants fifteen John Doe Officers and FBI Agents, alleging that they unlawfully detained several victims

---

[5]  Notably, both cases involved officers who affirmatively prevented others from rendering life-saving aid—a scenario not remotely similar to the facts of this case.  *See Olson v. Barrett*, No. 6:13-CV-1886-ORL-40KRS, 2015 WL 1277933, at *11 (M.D. Fla. Mar. 20, 2015) (concluding that the plaintiff had adequately pled a deliberate-indifference claim where officers chose not to render first aid and prevented others from doing so); *Waldron v. Spicher*, No. 5:16-CV-658-OC-32PRL, 2017 WL 3972464, at *6 (M.D. Fla. Aug. 11, 2017) (concluding that a plaintiff had adequately pled a deliberate-indifference claim where officers ordered a neighbor to stop administering CPR).  Moreover, our Court has just recently vacated the district court's decision in *Waldron*, concluding that the district court had relied on an incorrect standard when it rejected the defendant deputy sheriff's request for summary judgment based on qualified immunity.  We concluded that under the clearly established law known to the defendant at the time of his alleged misconduct, the plaintiff was required to prove more than "merely reckless or deliberately indifferent" conduct by the defendant, and instead was required to prove that the defendant acted with an intent to harm the plaintiff.  *Waldron v. Spicher*, No. 18-14536, ___F.3d___, manuscript op. 24, 25 n.7  (11th Cir. Mar. 25, 2020).

and seized their property.  On appeal, Plaintiffs challenge the district court's dismissal of these claims.  We conclude that dismissal was likewise proper as to these claims.

"As a general matter, fictitious-party pleading is not permitted in federal court."  *Richardson*, 598 F.3d at 738.  Although we have previously permitted claims against unnamed defendants under limited circumstances, we agree with the district court that those circumstances are not present here.  Our precedent has allowed plaintiffs to sue real parties under fictitious names only when use of a "John Doe" label is, "at the very worst, surplusage" because the plaintiff's description of the defendant is "sufficiently clear to allow service of process." *Dean v. Barber*, 951 F.2d 1210, 1215–16 & n.6 (11th Cir. 1992) (holding that the district court abused its discretion in denying a *pro se* plaintiff's motion to add as a defendant the "Chief Deputy of the Jefferson County Jail John Doe" because the description enabled service of process); *Richardson*, 598 F.3d at 738 (holding that the case did not fall within *Dean*'s "limited exception" to the rule against fictitious-party pleading because the description of the Doe defendant was insufficient to enable service); *see Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1318 n.4 (11th Cir. 2015) (noting that, because fictitious-party pleading is improper, "John Doe Deputies" were not proper defendants for an excessive-force claim).

16

Here, the district court correctly concluded that Plaintiffs failed to describe the John Doe defendants with enough specificity to enable service of process. *Dean*, 951 F.2d at 1215–16 & n.6. For some of the John Does, Plaintiffs' provided no descriptions at all. The remaining descriptions ranged in specificity from the highly generic (e.g., "a male detective," "one of the officers at the hospital," or "an FBI Agent") to the ever-so-slightly less generic (e.g., "[a] female white officer about 5 feet 10–11 inches in height" or "a middle-aged white male [officer]"). At best, however, these descriptions include only general physical attributes and a title that is held by many individuals. Thus, they fall well short of enabling a process server to identify a specific individual. Accordingly, Plaintiffs' descriptions did not render their "John Doe" labels mere "surplusage." *Id.*

Nevertheless, Plaintiffs argue that the district court should have permitted them to proceed against the unnamed defendants because discovery would likely have revealed their true names. We have indicated that whether "it [i]s clear that discovery would uncover [a] defendant's identity" is a relevant consideration when determining whether a plaintiff can pursue a claim against an unnamed defendant. *Id.* at 1216 (noting that the *pro se* plaintiff "brought to the attention of the court that [he] had yet to receive Sheriff Bailey's report, which would have provided [him] with the information needed to specifically name the 'Chief'"). But our precedent has never permitted John Doe pleading solely on the ground that

17

discovery might reveal an unnamed defendant's identity.  Instead, our precedent has always required an unambiguous description of a defendant that enables service of process.  *Id.* ("[The plaintiff's] description was sufficiently clear to allow service of process on the 'Chief.'"); *id.* at 1215–16 n.6 ("[The plaintiff] adequately described the person to be sued so that the person could be identified for service."); *Richardson*, 598 F.3d at 738 (affirming the dismissal of a John Doe defendant described as "John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute" because the description "was insufficient to identify the defendant among the many guards employed at CCI").

However, we need not decide today whether there is a "discovery" exception to the general rule against fictitious-party pleading because Plaintiffs did not seek discovery to identify the unnamed defendants.  Despite the district court's repeated warnings that John Doe pleading would not be permitted, Plaintiffs made little effort to resolve the problem and repeatedly agreed to stay discovery that they acknowledged was necessary to identify the John Does.  This sue-first-and-sort-out-the-defendant-later approach is not how litigation works in federal court.  As the district court aptly noted, a plaintiff who knows the name of one defendant but not another is not without recourse.  He can sue the party he knows, conduct discovery, and amend his pleadings or file a new case once he knows the name of other responsible parties.  Nevertheless, Plaintiffs chose to bring all their claims at

18

once to see how they would fare before doing the hard work that discovery requires. As the district court warned, those choices, which introduced procedural problems of Plaintiffs' own making, have consequences.

Under the circumstances, we cannot say that the district court erred in concluding that Plaintiffs' descriptions of the John Doe defendants were insufficient to enable service of process or abused its discretion in dismissing the fictitious defendants from the case. *See Richardson*, 598 F.3d at 738; *see also* Fed. R. Civ. P. 21.

### D.     The City of Orlando

Plaintiffs also sue the City, claiming that because the City failed to properly train its police officers, the City is liable for any constitutional violations arising from its officers' failure to protect them from Mateen's attack.[6] Yet, as the Supreme Court long ago held, a municipality cannot be vicariously liable for the actions of its employees. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983." (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Instead,

---

[6] As noted in the earlier discussion, Plaintiffs have failed to plausibly allege that the officers' failure to choose the most effective means of protecting them constituted a violation of their substantive due process rights. As any claim against the City for its failure to train necessarily derives from a constitutional violation by its employees that adequate training might otherwise have prevented, this conclusion could end any discussion of the City's liability. Nonetheless, we proceed with the analysis, assuming the possibility that the police officers violated Plaintiffs' substantive due process rights.

19

"a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *Id.* (emphasis in original). Thus, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (quoting *Monell,* 436 U.S. at 691).

Here, Plaintiffs allege that the City's failure to properly train its officers was a legal cause of Mateen's shooting of many patrons at the Pulse nightclub. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* at 61. Yet, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. Only then can a failure to train be fairly characterized as an actionable "policy or custom." *Id.* at 389.

Establishing "deliberate indifference" requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quotation marks omitted). Because "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional

20

rights" unless they have "notice that a course of training is deficient in a particular respect," a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quotation marks omitted).

Here, Plaintiffs never suggest that a pattern of prior similar constitutional violations put the City on notice of its need to train officers. Instead, in faulting the City for failing to provide training that would have reduced the loss of life during Mateen's shooting spree, Plaintiffs proceed only under *Canton*'s "single incident" theory of liability. That is, Plaintiffs acknowledge that nothing like this had ever occurred before in Orlando.[7] Although noting that ordinarily a pattern of similar constitution violations by untrained employees will be a prerequisite for a failure-to-train claim, the Supreme Court in *Connick* reasserted the possibility that "single-incident" liability could attach to a municipality "in a narrow range of circumstances" where there was an "obvious need for specific legal training," regardless of the absence of prior similar incidents. *Id.* at 63–64 (quotation marks omitted). And in the earlier *Canton* decision, the Court had hypothesized that there may be situations where "the need for more or different training is so obvious," given a specific officer's duties, "and the inadequacy [of the training is] so likely to

---

[7] Indeed, according to Defendants, "[a]t the time, the massacre at Pulse was the deadliest mass shooting in American history."

result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. As its example, the Court hypothesized that if a city armed its officers knowing "to a moral certainty" that officers would use their firearms to arrest fleeing felons, the need "to train officers in the constitutional limitations on the use of deadly force" would be "so obvious" that failure to do so would reflect deliberate indifference to constitutional rights, even without notice of prior constitutional violations. *Id.* at 390 n.10.

The district court concluded that Plaintiffs "did not plausibly allege that the City of Orlando's failure to train officers on security in public places that are highly susceptible to danger, and how to enter and neutralize an active shooter, fits within the narrow range" of circumstances giving rise to *Canton*'s hypothetical liability for a municipality based on a single incident. The court explained that Plaintiffs had failed to plausibly allege "that nightclubs are at such great risk of attack that a municipality's failure to train its police officers on how to respond and even 'neutralize an active shooter' amounts to deliberate indifference. The incredibly specific training envisioned by Plaintiffs on responding to and *neutralizing* a hypothetical active shooter without violating anyone's constitutional rights bears no resemblance to the use-of-deadly-force training envisioned in

22

*Canton.*"  The court further observed that neither the Supreme Court nor this Court has ever applied the single-incident liability exception.

We agree with the district court that Plaintiffs do not allege the type of factual scenario hypothesized by *Canton*:  a situation in which the risk of a constitutional violation is "so obvious" that failing to provide specific legal training amounts to deliberate indifference to constitutional rights.  *Canton*, 489 U.S. at 390.  The gist of Plaintiffs' conclusory and skeletal allegations is (1) that Officer Gruler violated their constitutional rights when, instead of immediately entering the club to engage in a shoot-out with Mateen, he decided to wait for reinforcements, and (2) that the other officers who subsequently arrived violated Plaintiffs' rights by waiting three hours to take out the shooter.  Defendants note that Plaintiffs' complaint omits relevant details about the shooting "documented in numerous investigatory reports and in the national media coverage," including the fact that the situation "rapidly developed from an active shooting into a hostage standoff with a barricaded gunman proclaiming affiliation with an international terrorist organization and threatening to detonate explosives."  Obviously, in a motion-to-dismiss context, we cannot accept as true Defendants' assertion, but must instead accept Plaintiffs' non-conclusory allegations.  That said, Plaintiffs' complaint touches on some of the uncertainty involved in the situation, alleging that after the shooting began and other officers arrived, some of those officers

23

"entered the club and engaged the shooter temporarily," but that "[d]uring this brief engagement, Shooter retreated further into Pulse, holding a number of patrons hostage in the Pulse restroom. Finally, approximately three (3) hours later . . . the police finally made their entry and neutralized Shooter."[8]

Yet, Plaintiffs never provide any specifics as to what they contend would have been constitutionally adequate training for such an unprecedented event with so many uncertain factors, or why the need for that very specific training would have been obvious to the City. Instead, they simply throw out the conclusory allegation that the City failed to "adequately" train its officers in how to "respond[] to active shooting situations." For sure, one hopes that police departments will be trained in the best practices for responding to shooting incidents, mass and otherwise. But to allege that a City's particular training program is so constitutionally deficient as to make the police officers and their superiors legally responsible for the acts of a mass murderer, a plaintiff must do a lot better than Plaintiffs do here with their skimpy, conclusory allegations. *See Twombly*, 550 U.S. at 555 (noting that a complaint "does not need detailed factual allegations" but must contain "more than labels and conclusions, and a formulaic recitation of

---

[8] Notably, these allegations undermine an inference that officers were entirely unprepared to respond to an active-shooter threat, as Plaintiffs alleges that "police finally made their entry and neutralized [the] Shooter." Likewise, in acknowledging that some officers had earlier entered the club in an effort to engage Mateen, but that these officers had to retreat because Mateen was holed up in a restroom with hostages, Plaintiffs contradict their own suggestion that the police were twiddling their thumbs while Mateen continued to shoot patrons in the club.

24

the elements of a cause of action"); *Iqbal*, 556 U.S. at 679 (noting that legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations").

Even if we assumed that the need for additional training was obvious, Plaintiffs' pleadings do not plausibly allege that the City's failure to train caused the alleged constitutional violations. *Connick*, 563 U.S. at 60–61. This is so because Plaintiffs' conclusory allegations include no factual assertion that proper training would have required officers to immediately enter the nightclub rather than to take some other prudent course of action. Thus, even taking the factual allegations in the light most favorable to Plaintiffs, the complaint does not plausibly show that, but for a lack of training, officers would have entered the nightclub sooner.[9]

In sum, Plaintiffs' second amended complaint did not plausibly plead that the City was deliberately indifferent to victims' constitutional rights. Accordingly, we affirm the district court's dismissal of Count IV.[10]

---

[9] In conclusory fashion, Plaintiffs also assert on appeal that, as to the John Doe defendants, there was an "obvious" need for "basic training" to "avoid situations, as described in the pleadings, where victims are treated as criminal suspects: detained, arrested, and personal property seized without any lawful basis whatsoever." Setting aside the fact that Plaintiffs' complaint does not allege an absence of "basic training," Plaintiffs have made no effort to describe the training necessary to avoid the alleged constitutional violations, much less why the need for such training was "obvious."

[10] On appeal, Plaintiffs do not appear to challenge the district court's dismissal of Counts I–III against the City of Orlando. In any event, the district court's ruling was correct. The second amended complaint names the City as a defendant in each count, but Counts I–III focus

## III.  MOTION FOR SANCTIONS

Defendants have moved for sanctions against Plaintiffs' counsel "for filing this frivolous appeal," asking for an award of attorney's fees, double costs, and non-taxable expenses.

We have authority to sanction attorneys who file frivolous appeals under Federal Rule of Appellate Procedure 38, 28 U.S.C. § 1927, and our inherent power. Fed. R. App. P. 38 (providing that we may "award just damages and single or double costs to the appellee" if we "determine[] that an appeal is frivolous"); 28 U.S.C. § 1927 (providing that we may require an attorney who "unreasonably and vexatiously" multiplies proceedings to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct"); *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (explaining that "bad faith" unlocks a court's inherent power to sanction attorneys "where an attorney knowingly or recklessly raises a frivolous argument," "argues a meritorious claim

---

exclusively on Officer Gruler's and the John Doe defendants' alleged misconduct, not the City's. Indeed, the City is not mentioned in the "General Allegations" section of the complaint or in the allegations specific to Counts I–III.  The only reference to the City pertinent to Counts I–III appears in a single paragraph in the complaint's background section, which Plaintiffs incorporated by reference into each count.  That paragraph alleges that the City's "policies and procedures, and training or lack thereof, demonstrated deliberate indifference" to Plaintiffs' rights, and that the City "had a duty to train and supervise its officers to ensure that they abide by the United States Constitution" and to maintain policies "that were in conformity with the United States Constitution."  As the district court correctly noted, this paragraph "stitches together a hodge-podge of legal conclusions and constitutional buzzwords."  It contains no factual content.  These conclusory allegations were insufficient to plead a plausible claim under any theory of liability.

26

for the purpose of harassing an opponent," or "delay[s] or disrupt[s] the litigation or hamper[s] enforcement of a court order" (quotation marks omitted)).

Here, while we agree with Defendants that Plaintiffs' arguments had little chance of success, "unpersuasive arguments" are not synonymous with "bad faith." We are reluctant to say that Plaintiffs arguments are so frivolous—that is, so lacking in legal or factual support—as to merit sanctions. Accordingly, Defendants' motion for sanctions is denied.

## IV.    CONCLUSION

The district court's order dismissing Plaintiffs' second amended complaint is **AFFIRMED**. Defendants' motion for sanctions is **DENIED**.

27